987 F.2d 685
 25 Fed.R.Serv.3d 706
 OKLAHOMA RADIO ASSOCIATES, an Oklahoma general partnership
of J. Patrick Collins and Greg L. Armstrong; J. Patrick
Collins, an individual; and Greg L. Armstrong, an
individual, Plaintiffs-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for
Citizens National Bank and Trust Company, Defendant-Appellee,
v.
MAGNOLIA BROADCASTING COMPANY, INC., Third-Party Defendant-Appellant.
 No. 89-6434.
 United States Court of Appeals,
Tenth Circuit.
 March 12, 1993.
 
 John C. McMurry (Gregg R. Maynard with him on the brief), Oklahoma City, OK, for plaintiffs-appellants and third party defendant-appellant.
 E. Whitney Drake, Sp. Counsel, F.D.I.C., Washington, DC (Mark I. Rosen, Deputy Gen. Counsel, Ann S. DuRoss, Asst. Gen. Counsel, Joan E. Smiley, Sr. Counsel, F.D.I.C., Washington, DC, and R. Pope Van Cleef, Jr. of Bush & Underwood, Oklahoma City, OK, with her on the brief), for defendant-appellee.
 Before TACHA, HOLLOWAY and BARRETT, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 Oklahoma Radio Associates (ORA), Magnolia Broadcasting Co., Inc. (Magnolia), J. Patrick Collins and Gregg L. Armstrong, appeal the grant of summary judgment to the appellee Federal Deposit Insurance Corporation (FDIC) by the district court on a counterclaim against the plaintiffs on two promissory notes and accompanying guarantees. The district court held that plaintiffs-appellants were estopped from asserting agreements between themselves and Citizens National Bank and Trust Company of Oklahoma City (Citizens) which affect the maturity dates of the two promissory notes. We affirm the district court's grant of summary judgment on the Magnolia note and accompanying guarantees. However, we reverse the judgment with respect to the ORA note and remand for further proceedings.
 
 
 2
 * ORA and its general partners, Collins and Armstrong, brought this action against the FDIC as receiver for Citizens, a failed national bank. ORA alleged that the FDIC had breached an agreement between Citizens and ORA to renew a $175,000 loan made by Citizens to ORA for the purpose of purchasing and operating an Oklahoma radio station. The FDIC then filed a counterclaim against ORA and a third party complaint against Magnolia, Collins and Armstrong. The counterclaim alleged that ORA was in default on a note, mortgage and security agreement discovered in Citizens' loan files after the bank's insolvency. The third party complaint alleged that Magnolia had defaulted on a similar note and other security documents and that Collins and Armstrong were guarantors of the Magnolia obligation.
 
 
 3
 The district court granted summary judgment in favor of the FDIC on its counterclaim and third party complaint, and an appeal was taken, Tenth Circuit No. 89-6107. This court, however, dismissed that appeal and remanded to the district court, stating in part that this "appeal is remanded to the district court for entry of a modified judgment pursuant to [Rule] 60(b)." On November 22, 1989, the district court entered a modified journal entry of judgment in favor of FDIC wherein ORA's liability was determined to be $158,109.80 of principal plus $70,722.76 in prejudgment interest. Magnolia's liability was determined to be $50,000 of principal, and interest was found due in the amount of $23,440.69 To facilitate an appeal, the parties stipulated to the interest rate used in this modified judgment. A second notice of appeal was filed on December 21, 1989, commencing the instant appeal.
 
 II
 
 4
 The facts of the underlying transactions are as follows. In May 1985 Armstrong and Collins approached John Osborne, a Vice President of Citizens Bank, seeking financing to purchase a radio station. After Citizens agreed to provide funding to Collins and Armstrong, they formed ORA and Magnolia. ORA was to own the real estate and transmission facilities for the radio station, and Magnolia was to hold the radio station license.
 
 
 5
 On July 16, 1985, ORA executed a promissory note payable to Citizens for the amount of $175,000 with interest set at 1.75% above Citizens' floating daily rate (ORA note). The ORA note had a maturity date of October 15, 1985, ninety days later. ORA received the proceeds of this loan and purchased the radio station facilities. In conjunction with the ORA note, an additional note (the Magnolia note) was given by Magnolia to Citizens which provided for revolving credit of $50,000 at 1.75% interest above Citizens' floating daily rate also, with all unpaid interest and principal due at the end of a year from the signing of the note. Magnolia promptly received $50,000 from Citizens as the proceeds of this note.
 
 
 6
 The plaintiffs claim that throughout their negotiations with Citizens, they informed the bank that a five year repayment period was a necessary precondition to the venture. They assert that they told Osborne that it would take a minimum of five years for the radio station to generate sufficient profits to repay the loan. The plaintiffs claim that Citizens agreed to this arrangement; however, the notes were to be renewed annually, in accordance with banking industry business practice, to enable the bank to "reprice" the interest rate in accord with prevailing rates.
 
 
 7
 A July 16, 1985, letter from Osborne to Armstrong was relied on by plaintiffs below in response to the FDIC counterclaim. This letter is said to show agreement for renewal of the $175,000 ORA note on a 60-month basis with a series of one year notes. See Part III, infra. The plaintiffs further rely on the loan application dated June 28, 1985, for the $175,000 loan to ORA as showing the bank's agreement for renewal of the ORA notes by the application's statement referring to maturity of the first note: "[a]t the 90 day maturity monthly payments of $4,000 (P & I) will begin which represents a 5 year or 60 month amortization." Doc. 70, Exh. 2 to Exh. A, Osborne Aff. Osborne's affidavit states that he caused the letter agreement and the loan application to be placed in the ORA file at Citizens Bank. The plaintiffs also insist that Osborne orally promised to roll any remaining amount due on the Magnolia note into the ORA note after the first year, in conjunction with the main agreement to renew.
 
 
 8
 On October 15, 1985, the ninety-day ORA note was renewed. The new note provided for payments in the sum of $4,000 per month. The note also stated that "[a]ll payments [are] to be applied first to accrued interest and then to principal, with outstanding principal balance plus unpaid accrued interest due on or before 8-15-86." The new ORA note had a block captioned heading saying "maturity date" under which the words "on demand no later than 8-15-86" appeared.
 
 
 9
 On August 14, 1986, the Comptroller of the Currency closed Citizens and the FDIC was appointed receiver. The Magnolia note and the ORA note, which had been renewed on October 15, 1985, matured the following day, August 15, 1986. After a review of the bank's records, FDIC elected to liquidate the bank. In mid-September 1986, Magnolia and ORA received letters from the FDIC demanding payment on the notes. Collins and Armstrong contacted an FDIC account officer and maintained that Citizens had promised to automatically renew the ORA note over the five year period and to roll Magnolia's note into ORA's. FDIC refused to renew or roll over either note and ORA and Magnolia ceased further payments. The plaintiffs assert that the FDIC's refusal to renew eventually forced the radio station out of business. This litigation followed.
 
 III
 
 10
 In the district court, the plaintiffs defended against FDIC's counterclaim on the notes by introducing the letter dated July 16, 1985, from Osborne to Armstrong on Citizens' letterhead. In relevant part, the letter provides:
 
 
 11
 Pursuant to our discussion this morning, I am writing to letter [sic] to confirm certain agreements. The initial note in the amount of $175,000.00 to Oklahoma Radio Associates is a ninety (90) day note with interest only due at maturity. At that time the note will be renewed on a 60 month basis with a series of one year notes, with monthly payments of $4,000.00 to be applied first to interest, then to principal.
 
 
 12
 Doc. 70, Exh. 1 to Osborne Aff. (Osborne letter). The plaintiffs also relied on the loan application dated June 28, 1985, for the ORA note, which stated:
 
 
 13
 This advance will be serviced by interest only first 90 days. At the 90 day maturity monthly payments of $4,000 (P & I) will begin which represents a five year or sixty month amortization.
 
 
 14
 Id. Exh. 2.
 
 
 15
 The FDIC liquidation assistant, Ms. Northcutt, indicated that the ORA loan application was found in Citizens' files. The FDIC disputed whether the letter of July 16, 1985, was also in the bank's files at the time of insolvency. Compare Doc. 70, Osborne Aff. at 3 (Osborne caused the July 16, 1985, letter agreement and the loan application to be placed in Citizen's ORA file) with id., Northcutt Depo. at 9, 14 (stating that the previous FDIC account officer told Northcutt she was unable to locate the Osborne letter in the ORA file; Northcutt indicated that she herself found ORA's loan application in the files).
 
 
 16
 FDIC moved for summary judgment on its counterclaim for recovery on the notes. FDIC asserted that ORA and Magnolia were estopped from raising the "side" agreements to renew the ORA note and roll over the Magnolia note as defenses to the counterclaim. The plaintiffs responded and filed a cross-motion for partial summary judgment on their breach of contract claim. The district judge granted summary judgment in favor of FDIC and dismissed the plaintiffs' cross-motion for partial summary judgment as moot, stating in part:
 
 
 17
 It is critically important that the bank's written records can be presumed to be what they say, and not overstate the bank's assets. Side agreements that would alter the terms of a note must be suspect.... In the case at bar there is a note that has an express, and unambiguous maturity date of 'On Demand No Later Than 8-15-86.' ... FDIC-R should have a right to enforce this asset at its face value. The July 16, 1985, Osborne letter, noted above, evidences at best a secret agreement that Citizens would not enforce the note on its express maturity date. The Court believes this is the type of situation that would tend to understate the facially enforceable assets of banks and is barred by the D'Oench, Duhme doctrine.
 
 
 18
 Doc. 78 (order of 2/22/89) at 8 (citing D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942)). The judge also said that:
 
 
 19
 a secret side agreement to not enforce the unambiguous language of a note serves to deceive bank examiners because it commits the bank's resources for an undisclosed period of time that cannot be determined from the note. Therefore the side agreement diminishes the apparent worth of the bank's anticipated cash assets while concealing the bank's obligations to debtors who may have become insolvent, or whose collateral has diminished in value.
 
 
 20
 Id. at 9.
 
 
 21
 The district court concluded that "[a] deception occurs when a bank tends to appear to its examiners to have committed its cash assets for a one year period, such as in the present case, when in reality it has a written or oral side agreement that obligates the cash assets for five years." Id. at 10. The court noted that "ORA is a completely innocent party" but indicated that this status was "irrelevant." Id. Accordingly, the court held that ORA was estopped by D'Oench from raising the renewal agreement as a defense to the FDIC's claim for payment of the note on its stated maturity date.
 
 
 22
 Separately, as to the Magnolia note, the district judge held that, "Any alleged oral agreements of waiver, rollover or renewal are simply ineffective against FDIC as they are [also] barred by estoppel." Id. at 14 (citing D'Oench ).
 
 IV
 
 23
 On appeal, ORA and Magnolia contend that the trial court erred in granting summary judgment premised on D'Oench estoppel because, in their view, the record fails to establish that the agreements to renew and/or rollover the notes were secret or that ORA and Magnolia ever lent themselves to a deceptive agreement. They also argue that D'Oench estoppel cannot apply because the record does not show that the financing arrangement had any tendency to deceive banking authorities.
 
 A. Standards of Review
 
 24
 The applicable standards of review are well settled. Our review of the district court's grant of summary judgment is de novo. Eaton v. Jarvis Prod. Corp., 965 F.2d 922, 925 (10th Cir.1992). Summary judgment is proper if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Additionally, "[w]e view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment." Eaton, 965 F.2d at 925. Moreover, the moving party has the burden of showing that it is entitled to summary judgment as a matter of law. Ewing v. Amoco Oil Co., 823 F.2d 1432, 1437 (10th Cir.1987). Once this burden is carried, however, the non-movants must go beyond the pleadings and by their affidavits, depositions, and the like show the existence of a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 
 B. The ORA Note
 
 25
 In moving for summary judgment, the FDIC as receiver argued to the district court that ORA should be precluded from defending against the counterclaim on the note because of D'Oench estoppel, inter alia. See Doc. 67 at 5-9 & n. 2. As noted, the district court granted summary judgment to the FDIC as receiver, concluding that ORA was estopped by D'Oench. In a footnote the court rejected application of § 1823(e), stating that "the Court must reject FDIC Receiver's argument that 12 U.S.C. § 1823(e) or its case law is applicable here. That law applies only to FDIC Corporate." The FDIC conceded this point below. However, in the interim Congress has amended § 1823(e), making the statute applicable to the FDIC as receiver, and on appeal the FDIC argues that § 1823(e) now applies here and bars the enforcement of the agreements alleged here affecting the terms of the two notes.
 
 
 26
 We believe that the district court erred in granting summary judgment as to the ORA note on this record on the basis of D'Oench estoppel. On the question of the applicability of § 1823(e) as amended by FIRREA, we conclude that the 1989 statute's extension to the FDIC as receiver of § 1823(e)'s provisions, relied on by the FDIC here, does not apply retroactively.
 
 1. D'Oench Estoppel
 
 27
 To properly analyze ORA's claims, we must first review the origin and development of the D'Oench doctrine. In D'Oench, the FDIC sued the maker of a $5,000 demand note payable to Belleville Bank and Trust Company. The FDIC acquired the note as collateral for a loan to Belleville to facilitate the assumption of Belleville's liabilities by another bank. After the FDIC initiated suit, the maker presented receipts for the note which indicated that there was an understanding between the maker and the bank that the note would not be called for payment. The original note was executed by the maker to enable Belleville Bank to cover up losses the bank suffered on defaulted bonds that the maker had earlier sold to the bank. As a result, the note prevented bank examiners from discovering the default on the bonds. In furtherance of the scheme, the note maker agreed to make interest payments on the note, later to be refunded, to allow the bank to keep it "as live paper." Id., 315 U.S. at 454, 62 S.Ct. at 678.
 
 
 28
 The Supreme Court recognized that § 12B of the Federal Reserve Act evidenced a federal policy "to protect [the FDIC], a federal corporation, from misrepresentations made to induce or influence the action of [the FDIC], including misstatements as to the genuineness or integrity of securities in the portfolios of banks which it insures or to which it makes loans." Id. at 459, 62 S.Ct. at 680. Accordingly, the Court said that if the secret agreement asserted in D'Oench were allowed as a defense, the maker of the note would be enabled to defeat the purpose of the statute "by taking advantage of an undisclosed and fraudulent arrangement which the statute condemns and which the maker of the note made possible." Id. at 461, 62 S.Ct. at 681. The breadth of the D'Oench doctrine is indicated by the Court's illustrations and comments that follow:
 
 
 29
 'The defendant may not have intended to deceive any person, but when she executed and delivered to the plaintiff bank an instrument in the form of a note, she was chargeable with knowledge that, for the accommodation of the bank, she was aiding the bank to conceal the actual transaction. Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.'
 
 
 30
 D'Oench, 315 U.S. at 459, 62 S.Ct. at 680 (quoting Mount Vernon Trust Co. v. Bergoff, 272 N.Y. 192, 5 N.E.2d 196, 197 (1936)).
 
 The Court further stated:
 
 31
 Plainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners. If the bank had wilfully padded the bank's assets with the spurious note in order to obtain insurance from respondent, there seems no doubt but that § 12B(s) would have been violated. Moreover, as we have seen, the inability of an accommodation maker to plead the defense of no consideration does not depend on his commission of a penal offense. The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.
 
 
 32
 D'Oench, 315 U.S. at 460, 62 S.Ct. at 680-81 (emphasis added).
 
 
 33
 Despite the force of the estoppel doctrine thus developed to protect the FDIC,[1] D'Oench "has not been read to mean that there can be no defenses at all to attempts by the FDIC to collect on promissory notes." FDIC v. McClanahan, 795 F.2d 512, 515 (5th Cir.1986). Indeed, D'Oench was held inapplicable in an FDIC suit on a note where the borrower was a completely innocent party and a victim of failure of consideration by a bank's misconduct; the borrower had not lent himself to any scheme or arrangement by which the banking authority was or was likely to be misled. FDIC v. Meo, 505 F.2d 790, 792 (9th Cir.1974). Moreover, D'Oench was held unavailable as a defense where the FDIC sought to enforce leases which facially manifested bilateral obligations; the obligor, which was required to purchase equipment by the lease terms, failed to do so and this failure of consideration was held to be an arguable defense, precluding summary judgment based on D'Oench estoppel. Howell v. Continental Credit Corp., 655 F.2d 743, 746 (7th Cir.1981); see also FDIC v. Wright, 942 F.2d 1089, 1097 n. 9 (7th Cir.1991) ("Courts have recognized that, when a writing manifesting bilateral obligations appears in the bank's records, D'Oench does not aid banking authorities.") (emphasis in original); FSLIC v. Two Rivers Associates, Inc., 880 F.2d 1267, 1275 (11th Cir.1989) ("If however, the records of a bank evidence all the obligations of the bank, the regulating authority will not be deceived. Thus, D'Oench does not bar the assertion of defenses based on a bilateral obligation which appears in the bank's records.").[2]
 
 
 34
 First, in response to the FDIC's D'Oench estoppel theory, the plaintiffs claim that the essential elements of the theory were not established by the FDIC in the summary judgment record, namely that there was no showing that ORA had "lent itself to a secret agreement that deceived or would tend to deceive" the banking authority. Brief of Appellants at 19. Instead, the plaintiffs argue that there was a master agreement between ORA and Citizens for five year financing; that the ORA October 15, 1985, note sued on by the FDIC (the renewal of the original July 16, 1985, ORA note) was executed pursuant to the letter signed by Vice President Osborne which memorialized that master agreement; and that this letter agreement, which contained Citizens' obligation to renew the notes for five years, was not even arguably "secret," but was in the bank's files. Id. at 19-21. Thus, the plaintiffs conclude that the summary judgment for the FDIC on the ORA note was error.
 
 
 35
 We agree with ORA that the summary judgment entered in favor of the FDIC on the ORA note cannot stand. The FDIC rejects the plaintiffs' arguments that there was a bilateral agreement shown by the loan application, the Osborne letter of July 16, 1985, and the renewal note dated October 15, 1985. The FDIC says that no documentation of the renewal agreement was found in the files of the failed bank and that the letter was not countersigned by any party, such as ORA. Appellees' Answer Brief at 6.
 
 
 36
 The latter argument of no countersignature is untenable. Under Oklahoma law, a writing can be binding if only signed by one party and accepted by the other. First National Bank of Berwyn v. Raymer, 180 Okl. 529, 71 P.2d 485, 487 (1937); see also 2 E.A. Farnsworth, Contracts § 6.8 at 146-47 (90). The showing here of the Osborne letter itself and the inference of its acceptance by ORA's execution of the notes is sufficient in these circumstances to prevent summary judgment. "We view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment." Eaton v. Jarvis Products Corp., 965 F.2d at 925.
 
 
 37
 We likewise are convinced that the FDIC's position that the Osborne letter was not shown to be in Citizens' loan files is unsound. There was clear evidence, presented in opposition to the FDIC's summary judgment motion, that Osborne's July 16, 1985, letter to Armstrong was in the files. Osborne himself attested that he caused this letter to be placed in the loan file, in accordance with his routine practice and custom. Doc. 70, Osborne Aff. at p 1, 9, 10. As noted, this letter memorialized the agreement of Citizens with ORA that "the [ORA] note will be renewed on a 60 month basis with a series of one year notes." In response, the FDIC cites the deposition of Ms. Northcutt, the current FDIC account officer, who states that she examined the files personally and was unable to locate the Osborne letter. Doc. 70, Exh. D at 12-14.
 
 
 38
 The record thus shows a genuine issue of material fact concerning the FDIC's D'Oench estoppel theory. The estoppel theory was an avoidance or affirmative defense to ORA's reliance on the asserted bilateral obligations of the parties, one that the FDIC was required to plead affirmatively. Fed.R.Civ.P. 8(c). The FDIC had the burden to make a showing on its D'Oench estoppel theory. FDIC v. Meo, 505 F.2d at 792; see also Paul v. Monts, 906 F.2d 1468, 1474 (10th Cir.1990) ("Estoppel is an affirmative defense upon which the defendant has the burden of proof."). As the non-moving party, ORA properly went beyond the pleadings and by Osborne's affidavit and the depositions, designated specific facts showing that there is a genuine issue for trial on the D'Oench estoppel issue--the presence vel non of the Osborne letter in Citizens' loan file. Celotex Corp. v. Catrett, 477 U.S. at 324, 106 S.Ct. at 2553. At trial on this genuine issue of fact, if it is found that an agreement to renew the ORA note was manifest in the Citizens' Bank files, then ORA will have established that D'Oench estoppel does not apply.[3]
 
 
 39
 Second, ORA says that D'Oench is inapplicable because the summary judgment record gave no indication that ORA lent itself to a deceptive agreement. Brief of Appellants at 22. ORA contends that the FDIC did not show any ORA deception or tendency to deceive the banking authorities, since the bank records showed the five year renewal agreement, and that ORA, Magnolia, Citizens' Senior Vice-President and the receiver agreed that ORA and Magnolia were not guilty of any wrongdoing, or careless or negligent conduct, much less reckless action. Brief of Appellants at 27.
 
 
 40
 We agree with this second argument of ORA that the summary judgment based on D'Oench was in error. It is true, as noted by the Fifth Circuit in FDIC v. McClanahan, 795 F.2d at 515, that the Supreme Court felt so strongly about the need to promote the D'Oench policies that it indicated the estoppel rule would apply even in cases where the maker of an instrument was "very ignorant and ill-informed of the character of the transaction[,]" D'Oench, 315 U.S. at 458-59, 62 S.Ct. at 680 (quoting Rinaldi v. Young, 92 F.2d 229, 231 (D.C.Cir.1937), and "may not have intended to deceive any person" and where "creditors may not have been deceived or specifically injured." Nevertheless, as noted earlier, McClanahan observed that D'Oench has not been read to mean there can be no defenses at all to attempts by the FDIC to collect on promissory notes. McClanahan itself recognized the force of the reasoning in FDIC v. Meo, 505 F.2d at 792, that D'Oench estoppel should not apply where the maker was "wholly innocent" and was "not negligent in failing to discover the manner in which the stock order was actually executed." See D'Oench, 315 U.S. at 474, 62 S.Ct. at 687 ("The [FDIC] would succeed only to the rights which the bank itself acquired where ordinary and good-faith commercial transactions are involved.") (Jackson, J., concurring).
 
 
 41
 In Agri Export Co-op. v. Universal Savings Association, 767 F.Supp. 824, 832 (S.D.Tex.1991), D'Oench was held inapplicable in a case where the plaintiff "did nothing that can be construed as participation in any type of scheme or arrangement whereby banking authorities were likely to be misled. There were no 'secret' or 'side' agreements of any kind, much less of a nature that would mislead banking authorities." In In re Kanterman, 97 B.R. 768, 776 (Bankr.S.D.N.Y.), aff'd, 108 B.R. 432 (S.D.N.Y.1989), D'Oench was held inapplicable and the FDIC's motion for summary judgment was denied for like reasons. The court concluded that "estoppel, in the absence of a secret agreement, turns on whether the defendant was wholly innocent and not reckless."[4] But see FSLIC v. Gordy, 928 F.2d 1558, 1567 n. 14 (11th Cir.1991) (Meo holding based on an outdated understanding of the D'Oench doctrine). We have considered Gordy, but cannot agree that Langley v. FDIC, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), which focused on § 1823(e), requires the rejection of Meo.
 
 
 42
 We feel that Langley supports this second argument of ORA that the summary judgment against ORA based on the D'Oench estoppel rule was not proper. Langley was decided under § 1823(e) as adopted in 1950. It held that Congress meant "agreement" in the statute to include more than promises to perform future acts; "agreement" also covers a condition to payment of a note, including the truth of an express warranty. Id. at 96, 108 S.Ct. at 403. However, the Langley Court considered the breadth of the D'Oench doctrine in construing the statute. Langley quoted from D'Oench's statement of the test for application of the estoppel, i.e., "when the maker 'lent himself to a scheme or arrangement whereby the banking authority was likely to be misled.' " Langley, 484 U.S. at 92, 108 S.Ct. at 402 (quoting D'Oench, 315 U.S. at 460, 62 S.Ct. at 681) (emphasis added in Langley ). Thus it is proper for ORA to argue that it had not lent itself to a scheme or arrangement by which the banking authority "was or was likely to be misled[,]" and that therefore the district court erred in applying the D'Oench estoppel.
 
 
 43
 Here, the FDIC points to no persuasive evidence in the summary judgment record to show that ORA lent itself to any scheme or arrangement that misled or was likely to mislead the banking authority. On the other hand, the affidavit of Mr. Osborne, submitted by ORA in opposition to the FDIC motion for summary judgment, directly denied any bad faith conduct and instead indicated only "ordinary and good-faith commercial transactions." D'Oench, 315 U.S. at 474, 62 S.Ct. at 687 (Jackson, J., concurring).[5] Moreover, in the deposition of Ms. Northcutt, the FDIC liquidation assistant, there are clear statements that there was no reason to believe that ORA or Magnolia were involved in any wrongdoing in their transactions, nor was there any reason to believe ORA or Magnolia were careless or negligent in the transactions. Ms. Northcutt said she found a loan application dated in 1985 for ORA in the files. Doc. 70, Exh. C at 14, 20, 26.
 
 
 44
 In sum, the record does not support the summary judgment entered below against ORA on the basis of the D'Oench estoppel rule. There are genuine issues of material fact about the presence of the Osborne letter agreement and the loan application being in the loan files of Citizens, and manifesting the asserted bilateral agreement of ORA and Citizens. Likewise, the record is insufficient to establish that ORA lent itself to a misleading scheme or arrangement so that the summary judgment under D'Oench was proper.
 
 2. 12 U.S.C. § 1823(e)
 
 45
 Eight years after D'Oench, Congress withdrew § 12B from the Federal Reserve Act, expanding and enacting it separately as the Federal Deposit Insurance Act, Pub.L. 967, 64 Stat. 873 (81st Cong., 2d Sess.1950) (FDIA).[6] On August 9, 1989, during the pendency of this appeal, § 1823(e) was amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183 (1989) (FIRREA). Among its important provisions, FIRREA changed the language of § 1823(e) to include protection for the FDIC and the Resolution Trust Corporation as receiver of any depository institution.
 
 
 46
 In light of these statutory changes, the FDIC now argues that under the strict and categorical requirements of § 1823(e), ORA cannot prevail here. It argues that the statutory requirements of § 1823(e): (1) for the agreement to be in writing, (2) for execution by the failed bank and any person claiming an adverse interest, including the obligor, and (3) approval by the board of directors or its loan committee as reflected in the minutes thereof, are not met. The FDIC here argues that FIRREA and these provisions relied on should be applied retroactively to the transactions in question and to this case. The FDIC says it is now entitled to the application of those strict and categorical requirements, and that because they are not met, the summary judgment for the FDIC should be affirmed on the basis of the new statutory provisions.
 
 
 47
 We are not persuaded. The argument for retroactivity of FIRREA so as to make the FDIC as receiver the beneficiary of the strict procedural requirements is not supported by our recent opinions. In DeVargas v. Mason & Hanger-Silas Mason Co., Inc., 911 F.2d 1377, 1389-1393 (10th Cir.1990), we declined to apply retroactively provisions of the Civil Rights Restoration Act of 1987 so as to invalidate the district court's summary judgment denying recovery under provisions of the Rehabilitation Act of 1973. We reviewed the retroactivity principles applied by the Supreme Court and concluded that the most recent decision, Bowen v. Georgetown University Hospital, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), should be followed. We concluded that where congressional intent on retroactivity is clear, it governs. 911 F.2d at 1390. We followed the presumption applied in Bowen that a statute is deemed to be effective only for the future unless a contrary intent appears. 911 F.2d at 1392.
 
 
 48
 We are persuaded that we should here apply our most recent retroactivity decision in DeVargas and hold that FIRREA does not, as to the strict and categorical requirements of § 1823(e), apply retroactively to the commercial transactions involved here which were entered into several years before the enactment of FIRREA. The parties have not directed us to any legislative history which would indicate clear congressional intent on the question of retroactivity of § 1823(e). We have found only one statement, and it militates against retroactivity.[7] There appears to be a consensus among the courts that clear indications on retroactivity cannot be found in the legislative history. See FDIC v. Wright, 942 F.2d 1089, 1095 (7th Cir.1991); FDIC v. Dalba, No. 89-C-712-S, 1990 WL 43750 at * 3 (W.D.Wis. Feb. 27, 1990); FDIC v. Cherry, Bekaert & Holland, 129 F.R.D. 188, 192 (M.D.Fla.1989).[8] In another context, we have held that limitations provisions of FIRREA should not be applied retroactively so as to revive claims which were already barred by state law when the FSLIC (later the FDIC) was appointed receiver, FDIC v. Regier Carr & Monroe, 1993 WL 43761 (10th Cir. 2/17/93) (No. 92-7109).[9]
 
 
 49
 For these reasons we conclude that FIRREA's extension to the receiver of § 1823(e)'s provisions, relied on by the FDIC here, does not apply retroactively to the transactions involved here.
 
 C. The Magnolia Note
 
 50
 In light of the foregoing analysis, however, we conclude that the district court correctly held that Magnolia was estopped to assert an oral agreement to roll its note into ORA's note. Unlike ORA, Magnolia can point to no written record contained in Citizen's loan files which could possibly have alerted the FDIC to a qualification not present on the face of the Magnolia note.
 
 
 51
 As the Supreme Court stated in Langley, "one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities[.]" Id., 484 U.S. at 93, 108 S.Ct. at 402. Magnolia is thus clearly estopped under D'Oench to rely on the oral agreement. Accordingly, we affirm the district court's grant of summary judgment to the FDIC on the Magnolia note and its accompanying guarantees by Collins and Armstrong.
 
 V
 
 52
 As a final matter, the appellants challenge the district court's grant of the FDIC's Rule 60(b) motion to amend the original judgment to include prejudgment interest. Because we are reversing the grant of summary judgment on the ORA note and hence the judgment on the principal sum, the award of prejudgment interest thereon is also reversed and the question must be considered anew on remand. However, because we hold here that the judgment on the Magnolia note was proper we must consider whether the amendment of the judgment to include prejudgment interest for that sum was also proper.
 
 
 53
 We review the district court's order for an abuse of discretion. White v. American Airlines, Inc., 915 F.2d 1414, 1425 (10th Cir.1990). F.R.Civ.P. 60(b) provides, in part:
 
 
 54
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; ... or (6) any other reason justifying relief from the judgment.
 
 
 55
 It was on grounds (1) and (6) that the district judge founded his ruling. Transcript of Proceedings on 11/21/89 at 20. Specifically he found that the FDIC had sought prejudgment interest from the very beginning of this case and the FDIC's previous counsel had inadvertently failed to include the amount of prejudgment interest in the statement of uncontroverted facts because Magnolia and ORA had been silent on the issue. We have reviewed Ms. Moore's affidavit and find that it provided an adequate factual basis for the district court's conclusion.[10] We conclude, therefore, that the grant of the FDIC's rule 60(b) motion was within the sound discretion of the trial court.
 
 VI
 
 56
 The modified judgment in favor of the FDIC and against ORA on the ORA note and the summary judgment ruling for FDIC thereon are REVERSED. The modified judgment in favor of the FDIC against Magnolia on the Magnolia note, including the award of prejudgment interest, based on the summary judgment ruling for the FDIC, is AFFIRMED. The cause is REMANDED to the district court for further proceedings in accord with this opinion on the claims relating to the ORA note.
 
 
 57
 Although the respondent in D'Oench was the FDIC in its corporate capacity, the Court heavily relied on Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940), as the basis for the estoppel principle developed. Because Deitrick involved the FDIC as receiver, it has been held that the common law rule of D'Oench also applies to the FDIC as receiver. See FDIC v. McClanahan, 795 F.2d 512, 514 n. 1 (5th Cir.1986). We agree with this reasoning.
 
 
 
 [2]
 The FDIC relies on FDIC v. Plato, 981 F.2d 852 (5th Cir.1993), in support of its position on D'Oench. That opinion does contain an alternative ground of decision applying D'Oench because the promissory note found by FDIC auditors there made no reference to a related document relied on. Id. at 857. However, the opinion also pointed out that the letter of credit applications relied on by the obligors there had no "cross-reference to any promissory note. Indeed, the extensive boilerplate language appears to constitute a discrete bilateral contract between the applicant and the bank; no promissory note is contemplated by its terms." 981 F.2d at 856. The court noted that the "only nexus between the promissory note and security agreement, on the one hand, and the application and letter of credit, on the other hand, is a parol agreement between [the bank and the buyers]...." Id. (emphasis in original)
 Thus the basic facts in FDIC v. Plato are in sharp contrast with those in our case. Here the letter confirming the agreement to renew the initial ORA note specifically says "[t]he initial note in the amount of $175,000.00 [of] Oklahoma Radio Associates is a ninety (90) day note with interest only due at maturity." This letter, signed by Citizens' Senior Vice President Osborne, was dated the same day as the original July 16, 1985, note of ORA, which was executed by ORA as the obligor, and which was in the exact amount of $175,000 in the letter, with maturity on demand no later than October 15, 1985, and with interest payable at maturity. The links between the documents here were thus clear and numerous, unlike the situation in FDIC v. Plato.
 
 
 [3]
 We have earlier referred to the loan application of ORA which preceded the execution of the first note of July 15, 1985, the Osborne letter of July 16, 1985, and the renewal note of September 15, 1985, the last instrument being that on which the counterclaim of the FDIC was made. In connection with the loan application, we feel it significant that the loan application itself indicated that the $4,000 payments of principal and interest represented "a five year or 60 month amortization." Doc. 70 Exh. D. Thus the bilateral obligations of the parties and the commitment of Citizens to renew the note are arguably supported by the loan application, as well as the statements in the Osborne letter
 
 
 [4]
 Several commentators agree. See C. Goforth, Criticizing the Financial Insurance Agencies' "Superpowers", 22 Ariz.St.L.J. 195, 205-06 (1990) ("Various cases have demonstrated that when an obligor is wholly without fault ... the D'Oench doctrine does not operate to bar such defenses even against the FDIC.") (citing Meo); J. Platt and R. Darby, A Primer on the Special Rights and Immunities of the Federal Deposit Insurance Corporation, 11 Okla.City Univ.L.Rev. 683, 703 (1986) ("[I]n order for an obligor to be estopped to assert a claim or defense under [D'Oench ], it must have engaged in some culpable conduct, however slight."); Note, Borrower Beware: D'Oench, Duhme and Section 1823 Overprotect the Insurer When Banks Fail, 62 S.Cal.L.Rev. 253, 289 (1988) ("The Meo opinion provides an excellent example of the proper manner in which a court should examine conduct of the borrower to determine whether that conduct created an estoppel.")
 
 
 [5]
 In his affidavit Mr. Osborne stated that in all of 1985 he was Vice-President and Loan Officer at Citizens. In approximately June 1985 he was promoted to Senior Vice-President and was Citizens' account officer for ORA and Magnolia
 Exhibit 1 to Osborne's affidavit was stated by him to be the letter of July 16, 1985, to ORA with the provision for the 60 month or five year renewal. Osborne, as noted earlier, said that he "caused the letter agreement, Exhibit 1, and the loan application, Exhibit 2, to be placed in the ORA file at Citizens." Mr. Osborne then added:
 I did not conceal or attempt to conceal the agreement between ORA and Citizens from anyone at Citizens or from anyone outside of Citizens such as the Comptroller of the Currency, the Federal Deposit Insurance Corporation or creditors of Citizens, and I do not know of anyone at Citizens who tried to keep the agreement between ORA and Citizens a secret.
 
 
 [6]
 As originally enacted, § 1823(e) provided in relevant part that:
 No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.
 
 
 [7]
 Shortly before passage of the bill, Rep. Ortiz made the following comments:
 "Mr. Speaker, I seek to clarify the intent and effect of the prospective application of the proposed bill. I understand that this bill would redefine and augment the powers of the Federal Deposit Insurance Corporation when that Corporation serves as a receiver for a failed financial institution. The powers set forth in this bill are, in many respects, new, and there is no intent that such powers be applied to receiverships that have been established prior to the enactment of this bill."
 
 
 [135]
 Cong. Rec. H5003 (daily ed. August 1, 1989)
 
 
 [8]
 These three opinions applied FIRREA retroactively under the analysis in Bradley v. School Board of City of Richmond, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). As noted earlier, we elected instead to follow the Bowen analysis in our DeVargas opinion
 
 
 [9]
 Cf. United States v. Taliaferro, 979 F.2d 1399, 1403 (10th Cir.1992) (FIRREA provision making longer federal criminal statute of limitations apply retroactively to criminal offense committed before enactment of FIRREA did not violate Ex Post Facto Clause). In other instances we have declined to rule on the retroactivity of some provisions of FIRREA where the result would have been the same under FIRREA or existing federal common law. Castleglen, Inc. v. RTC, 984 F.2d 1571 (10th Cir.1993); Dababneh v. FDIC, 971 F.2d 428, 434 (10th Cir.1992)
 
 
 [10]
 The affidavit of Ms. Moore pointed out that with the FDIC's motion for summary judgment and brief in support, there was filed an affidavit of Ms. Northcutt. The statement of uncontroverted facts in the brief referred to two loan histories and a commercial loan reminder. They reflected the principal amounts due and owing on both notes, together with interest which had accrued through a day certain as to both notes. Ms. Moore said that the reason the statement of uncontroverted facts did not include the interest figures from the attached Northcutt affidavit was that such interest figures were not deemed necessary because the question of interest had never been raised as an issue in the case. Doc. 129, Exh. B at 3-4